IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

THE CONFEDERATED TRIBES OF            No. 3:17-cv-01649-HZ
THE WARMS SPRINGS RESERVATION
OF OREGON,

              Plaintiff,

     v.

VANPORT INTERNATIONAL, INC.,            OPINION & ORDER

            Defendant.

Albert Kennedy
TONKON TORP LLP
1600 Pioneer Tower
888 S.W. Fifth Avenue
Portland, Oregon 97204

John Newton
Tyler J. Moore
KARNOPP PETERSEN LLP
360 S.W. Bond Street, Suite 400
Bend, Oregon 97702

      Attorneys for Plaintiff

Robert D. Scholz
Samantha N. Javier
Megan L. Ferris
MacMILLAN SCHOLZ & MARKS, P.C.
900 S.W. Fifth Avenue, Suite 1800
Portland, Oregon 97204

Attorneys for Defendant

HERNANDEZ, District Judge:

Plaintiff The Confederated Tribes of the Warms Springs Reservation of Oregon (Plaintiff or "the Tribe"), had a contractual relationship with its wholly owned commercial forest products entity Warms Springs Forest Products Industries (WSFPI), under which WSFPI purchased Tribal Timber from the Tribe. WSFPI had a contractual relationship with Defendant Vanport International, Inc. (Defendant or "Vanport"), under which Defendant operated WSFPI and purchased and/or marketed sales of Tribal Timber or lumber milled from that timber. In this lawsuit, Plaintiff seeks from Defendant the value of Tribal Timber that WSFPI purchased from the Tribe and for which WSFPI failed to make payment. Presently, Plaintiff moves for summary judgment on its single claim in which Plaintiff seeks $2,416,731, the unpaid value of the Tribal Timber. Compl. ¶ 20, ECF 1. I deny the motion.

## BACKGROUND

### I. The Parties and WSFPI

The Tribe is a federally recognized, self-governing, sovereign Indian tribe consisting of three Indian tribal groups: the Warm Springs, the Wasco, and the Pauite. The Tribe is the legal successor in interest to the Indian signatories to the Treaty between the United States and the Tribes of Middle Oregon, which was executed on June 25, 1855, and ratified by Congress on

March 8, 1859 ("the 1855 Treaty"). Pursuant to the 1855 Treaty, the Tribe ceded approximately ten million acres of its aboriginal territory to the United States and reserved approximately 640,000 acres for exclusive use and occupation of the Tribe and its members as a permanent homeland, referred to as the Warm Springs Reservation. The United States holds legal title to almost the entire Warm Springs Reservation in trust for the benefit of the Tribe or its members.

In 1934, Congress passed the Indian Reorganization Act of June 18, 1934 ("IRA"), which, among other things, provided for the political organization of Indian tribes under § 16 and then, in § 17, empowered the Secretary of the Interior to issue corporate charters to tribes to enable them to conduct business. 25 U.S.C. §§ 5123, 5124. As the Ninth Circuit explained in a 1985 case, § 16 of the IRA allows tribes to organize tribal governments and adopt constitutions and bylaws. *White Mountain Apache Tribe v. Williams*, 810 F.2d 844, 866 n.17 (9th Cir. 1985). Section 17 then authorizes a tribe organized under § 16 to request the Secretary of the Interior to issue charters of incorporation. *Id.*

Under § 16 of the IRA, the Tribe adopted its Tribal Constitution. Tsumpti Decl. ¶ 6, ECF 55. Pursuant to the Tribal Constitution, certain enumerated governmental powers are vested in the Tribal Council. *Id.* ¶ 8. The Tribal Council has eleven members. *Id.* Eight members are elected positions with the three remaining positions reserved for lifetime chieftain positions, one for each of the three constituent tribes of the Tribe. *Id.* The Tribal Council oversees the Tribe's governmental services, including natural resource management, a court system, police, fire protection, water and sewer services, and social services. *Id.* Pursuant to the Tribal Constitution and the Tribal Corporate Charter, Tribal Council also exercises the corporate powers of the Tribe for economic development purposes. *Id.* ¶ 9.

3 - OPINION & ORDER

The Tribe's Tribal Corporate Charter was issued under § 17 of the IRA on April 23, 1938. *Id.* ¶ 6. On April 11, 1967, the Tribal Council created WSFPI pursuant to the Tribal Corporate Charter. *Id.* ¶ 10. According to the WSFPI Plan of Operation, WSFPI's original purposes and objectives included, among other things: (1) the promotion of "better and fuller development and utilization of the Reservation timber resources on a sustained yield basis"; (2) the construction or purchase of an industrial complex suitable to the manufacture of forest products from the Indian forest; and (3) the operation of the industrial complex so as to secure the maximum economic return from the timber resources consistent with providing the Tribe and its enrolled membership with education and training benefits, employment opportunities, and such social benefits as may flow therefrom. *See* Tsumpti Decl. ¶ 10; *Id.*, Ex. 5 (WSFPI Plan of Operation).[1] WSFPI is a "tribal forest enterprise" as defined in the relevant regulations. 25 C.F.R. § 163.1.

Defendant is a private company, headquartered in Boring, Oregon. Paul Owen Decl. ¶ 4, ECF 68. Beginning in 2008, Defendant entered into contracts with WSFPI regarding the operation of WSFPI's sawmill and the purchase of Tribal Timber. Under later agreements between Defendant and WSFPI, Defendant was to provide export sale, marketing, and other services to WSFPI. Details regarding these contracts are set forth below.

II. WSFPI Timber Contracts With the Tribe

A. United States as Title Holder

The United States holds legal title to the Warm Springs Reservation forest lands in trust for the benefit of the Tribe and its members. *See Seminole Nation v. United States*, 316 U.S.

---

[1] Tribal Council approved an amendment and restatement of the WSFPI Plan of Operation in 1992 and 1998, respectively. Tsumpti Decl. ¶ 10 n.1. The purposes and objectives noted above did not change. *Id.*, Exs. 6, 7.

286, 296 (1942) (federal government has "distinctive obligation of trust" in its dealings with

Indian tribes).  In a 1939 case, the Supreme Court explained:

> Under the provisions of the treaty and established principles applicable to land reservations created for the benefit of the Indian tribes, the Indians are beneficial owners of the land and the timber standing upon it and of the proceeds of their sale, subject to the plenary power of control by the United States, to be exercised for the benefit and protection of the Indians.

*United States v. Algoma Lumber Co.*, 305 U.S. 415, 420 (1939).  Before 1910, Indian tribes had

no right to sell timber on reservation land but that year, Congress passed the Act of June 25, 1910

which authorized the Secretary of the Interior to provide for the harvesting of tribal timber "in

such a manner as to conserve the interest of the people on the reservations, namely, the Indians."

*United States v. Mitchell*, 463 U.S. 206, 220 (1983) (internal quotation marks omitted).  As noted

above, in 1934 Congress passed the IRA which, in addition to allowing the political organization

of tribes and creating the ability for tribes to obtain charters of incorporation, directed the

Department of the Interior to manage Indian forest resources "on the principle of sustained-yield

management."  *Id.* at 221 (internal quotation marks omitted).  According to the Supreme Court,

the tribal timber management statutes found in 25 U.S.C. §§ 406-07 and 5109, and the

regulations promulgated thereunder at 25 C.F.R. Part 163, "establish the comprehensive

responsibilities of the [United States] in managing the harvesting of Indian timber."  *Id.* at 222.

In 1990, Congress passed the National Indian Forest Resources Management Act

(NIFRMA), 25 U.S.C. §§ 3101-3120.  There, Congress expressly found and declared that "the

forest lands of Indians are among their most valuable resources" and that there is "a serious threat

to Indian forest lands from trespass and unauthorized harvesting of Indian forest land resources."

25 U.S.C. § 3101(1), (6).  Congress also found and declared that the United States has a trust

responsibility toward Indian forest lands. 25 U.S.C. § 3101(2). The Secretary of the Interior is statutorily required to undertake certain "forest land management activities" on Indian forest land, which include "all aspects of the preparation, administration, and supervision of timber sale contracts." 25 U.S.C. § 3104(a) (setting forth requirement); 25 U.S.C. § 3103(4)(G) (defining "forest land management activities").

### B. Cutting Contract

#### 1. Terms

Pursuant to federal law, WSFPI, the Tribe, and the Bureau of Indian Affairs (BIA) entered into an agreement governing WSFPI's purchase of Warm Springs Reservation timber. By May 2004, the timber purchase agreement was titled the "Timber Allocation and Sales Agreement" and referred to as the "Cutting Contract." Tsumpti Decl. ¶ 11; *see also id.*, Ex. 8 (Tribal Council resolution approving the Cutting Contract; Cutting Contract). The named parties to the Cutting Contract are WSFPI and the Tribe. *Id.,* Ex. 8 at 5, § 2. The Secretary of the Interior and the Assistant Secretary for Indian Affairs granted "their Accommodation Approval and Consent to ensure compliance with the provisions of 25 U.S.C. § 81." *Id.*, § 3.

The Cutting Contract gave WSFPI the right to enter into contracts with the Tribe for the purchase of Tribal Timber which included (1) timber grown on tribal trust lands; (2) trust allotments in which the Tribe had more than a fifty-percent ownership interest; and (3) tribal fee lands within the Warms Springs Reservation. *Id.* at 8, §§ 4j, 5. The Cutting Contract was effective May 1, 2004 and was to remain in force through December 31, 2011, unless terminated in writing before that date with the approval of the Approving Officer, meaning the Secretary of the Interior or his/her designee. *Id.* at 12, § 5g. After December 31, 2011, the agreement could

be renewed by consent of the parties with approval by the Approving Officer.[2]  *Id.*

Under Section 6 of the Cutting Contract, which governs "Payment for Timber," payment by WSFPI for Tribal Timber was to

> be in accordance with 25 CFR § 163.22 unless other provisions are stipulated within the timber sale contract as provided in 25 CFR § 163.19.  Not later than the twenty-fifth day of each month, the Bureau [of Indian Affairs] shall submit a bill for collection for timber harvested during the immediately preceding month.  Enterprise [WSFPI] shall pay for Tribal timber monthly, within five (5) business days of receipt of the bill for collection.  Any discrepancy in the bill for collection shall be addressed in following month bills for collection.

*Id.* at 14, § 6a.  Thus, the terms of the Cutting Contract required the BIA to invoice WSFPI for the Tribal Timber and for WSFPI to pay for the invoiced Tribal Timber within five days.  The Cutting Contract does not expressly state to whom WSFPI was to make payment.

Under 25 C.F.R. § 163.22, "payment for forest products [is] required *in advance of cutting for timber, or removal for other forest products.*"  25 C.F.R. § 163.22(a) (emphasis added).  This regulation does *not* apply, however, to Indian tribal forest enterprises.  *Id.*  Because WSFPI is an Indian tribal forest enterprise, it was exempt from the pre-payment requirement.  Thus, the Cutting Contract's payment provision governing WSFPI's payments for Tribal Timber and which did not require pre-payment, was consistent with§ 163.22(a).

The Cutting Contract also provided that timber would be sold under the "terms and conditions in a Contract Form . . . agreed to" by the Tribe and WSFPI, and approved by the BIA.  Tsumpti Decl., Ex. 8 at 11-12, § 5f.

/ / /

---

[2] The parties have not directed the Court to evidence showing that the parties renewed the Cutting Contract but presumably, based on the parties' conduct, it was renewed and remained operative.

2. Compliance with Invoice/Payment Obligations

Despite the payment provision language in the Cutting Contract stating that the BIA was to issue invoices to WSFPI, the preparation and issuance of Tribal Timber invoices to WSFPI was actually performed by tribal personnel. Javier Decl., Ex 1 (Stacona Dep.) 105-06, ECF 66-1. The record indicates that while the BIA was technically responsible under the Cutting Contract for invoicing WSFPI for the Tribal Timber, the invoicing function was actually performed by Tribe employees on behalf of the BIA which then reimbursed the Tribe in some fashion for the use of Tribe personnel. *Id.*

Invoicing was routinely untimely. For twenty-three years, Louise Katchia, a Tribal member, processed "stumpage billing" for "the forestry under BIA" and as a tribal employee. Javier Decl., Ex. 8 (L. Katchia Dep.) 9, ECF 66-8; *see also id.* at 29-31 (explaining that she performed this function on behalf of the BIA initially but then, at some point, the responsibility was transferred from the BIA to the Tribe). She tracked all the logs and stumpage volume removed from the reservation through a log scale data system. *Id.* at 25. She invoiced WSFPI for the Tribal Timber. *Id.* at 36 (she starting invoicing WSFPI in 1996 and continued until WSFPI closed). She testified in deposition that there were problems processing stumpage bills on a timely basis at least as far back as 2007 and continuing until WSFPI closed. *Id.* at 85. Louise Katchia explained that because WSFPI was "one of their own," there were "certain allowances back and forth" made about the payment obligations. *Id.* at 111. She explained: "We've never wrote them down and said, okay, you could take six to eight weeks instead of the 25 days. None of that's ever written down, but it's understood." *Id.*; *see also id.* at 112 (further explaining the late invoicing and payments as "[i]t's like a gentlemen's agreement as with any

tribal enterprise. There's always allowances both ways."). Louise Katchia was not concerned about payment arrearages except at year's end. *Id.* at 122.

Others also noted the lag in invoicing. John Katchia worked for the WSFPI mill from 1989 until its closure in April 2016 in various positions and divisions, becoming Operations Manager at some point and then the CEO of WSFPI in July 2014. Javier Decl., Ex. 4 (J. Katchia Dep.) 20-31, ECF 66-4. John Katchia's understanding was that "the Tribe was responsible for the invoicing." *Id.* at 46. He also stated that "it was kind of haphazard from the Tribes about when we [referring to WSFPI] would receive the invoicing." *Id.* at 46 (further explaining that the Tribe's forestry department did the billing). According to John Katchia, invoicing for stumpage was sometimes delayed six to sixteen months. John Katchia stated that the payment provision in § 6 of the Cutting Contract was never complied with at any time before his becoming CEO of WSFPI in July 2014. *Id.* at 116.

Orvie Danzuka, whom Defendant identifies as a member of the Tribe with a degree in natural resources from Oregon State University, and an experienced forestry technician, was a member of the Tribal Council from May 2013 to May 2016, and as a result, he was a member of the "Tribal Council WSFPI Board"[3] from June 2013 to the fall of 2014. Javier Decl., Ex. 3 (Danzuka Dep.) 15-16, 66, 69, 163, ECF 66-3. Danzuka states that the Tribe did not press WSFPI to meet its contractual payment deadlines because the tribal Forestry Department which issued the invoices on behalf of the BIA, was slow in getting the invoices out and there were times WSFPI needed the money for other reasons. *Id..* at 88-89. In early 2014, the Tribal

---

[3] As explained below, there were periods of time when the Tribal Council substituted itself for the WSFPI Board. When that occurred, references are to the "Tribal Council WSFPI Board."

Council WSFPI Board granted WSFPI's request to defer Tribal Timber payments for March, April, and May 2014. Danzuka Dep. 115; J. Katchia Dep. 50. According to former Tribal Council member, former Tribal Council Chair, and former WSFPI Board Chair Austin Greene, WSFPI hoped to pay for the remainder of its 2013 Tribal Timber payment obligation as cash flow stabilized in October to December 2014. Javier Decl., Ex. 2 (Greene Dep.) 131-32, ECF 66-2; Javier Decl., Ex. 34, ECF 66-34. At a September 30, 2014 Tribal Council meeting, WSFPI management told Tribal Council that the Tribe had yet to invoice WSFPI for Tribal Timber from June to December 2013 and that WSFPI would pay when it had enough cash. Javier Decl., Ex. 35 at 2-3, ECF 35; *see also* L. Katchia Dep. 102 (stating that her supervisor instructed her to hold off on issuing a number of Tribal Timber invoices past the due date under the Cutting Contract).

In September 2014, the BIA inquired and learned that WSFPI was six months behind on Tribal Timber payments. Ken Borchert, a member of the Cowlitz Tribe who has a forest management degree from Oregon State University, worked for the Tribe as an inventory forester from 1995 to 2003 and then as a forest planner employed by the BIA who worked exclusively on the Warm Springs reservation. Javier Decl., Ex. 7 (Borchert Dep.) 16-19, 23-24, ECF 66-7. He held that position until 2008 when the Tribe contracted with the BIA to provide its own forestry program. *Id.* at 25 (explaining that "basically, the Tribe assumed the role of the [BIA] forestry staff"). The Tribe offered Borchert the same position he had with the BIA which he took and held for about six months. *Id.* at 27. He later returned to the BIA in 2011 as a regional forest developer. *Id.* at 28-29. Borchert testified that under the Cutting Contract, meaning since 2004, "they [referring to WSFPI] tried to follow this [referring to the Cutting Contract payment schedule] but some months they weren't right on time, but at least the payment was coming." *Id.*

at 161. In 2014, however, there was not one instance where payment was on time. *Id.* When

Borchert asked how the arrearages had gotten to be more than $4.1 million as of year end 2014,

he was told that because WSFPI had stopped paying, the Tribe had not produced the invoices.

*Id.* at 161-62. By year end 2014, the BIA was aware of large Tribal Timber arrearages. *Id.* at

153, 155.

    C. Timber Sale Contracts Between WSFPI & the Tribe

    As noted, the Cutting Contract allowed WSFPI to enter into timber sale contracts with the

Tribe. Plaintiff submits six timber sale contracts, each of which were prepared on a standard

form created by the BIA. Brunoe Dec., Exs. 1-6, ECF 59; *see* 25 C.F.R. § 163.19(a) (providing

that in sales of tribal forest products with an appraised stumpage value exceeding $15,000, the

parties must use contract forms approved by the Secretary of the Interior unless the Secretary

approves a special form). "Stumpage value" is defined as "the value of a forest product prior to

extraction from Indian forest land." 25 C.F.R. § 163.1. The parties to these timber sale contracts

were WSFPI and the Tribe. Brunoe Decl., Exs. 1-6. The contracts were approved by the BIA

Superintendent of the Warms Spring Agency. *Id.*

    Each contract covers a separate timber sale. They have approval dates of December 14,

2011, December 18, 2012, June 27, 2013, October 16, 2013, October 9, 2014, and November 2,

2015. Brunoe Decl., Exs. 1-6. Section A4 of each of these contracts states that the

> Seller [the Tribe] agrees to sell to the Purchaser [WSFPI] and [WSFPI] agrees to
> buy, in accordance with the terms and conditions of this contract and the attached
> Part B, Standard Provisions, which are made a part hereof, all merchantable
> timber, living or dead designated by the [BIA] . . . within the boundaries of this
> logging unit.

*Id.* Section A8 of each of these contracts governs payment for timber and provides that the

"Purchaser [WSFPI] shall pay for all timber covered by this contract in accordance with the provisions of Section B4.0 of the Standard Provisions or Section 6a & 6b of the approved [Cutting Contract]." *Id.*

The Part B Standard Provisions do not appear to have actually been attached to Part A of each contract as represented in § A4. Nonetheless, the Part B Standard Provisions include § B2.1 which states that "[t]itle to the timber covered by the contract shall not pass to [WSFPI] until it has been scaled, paid for, and removed from the contract area." *Id.*, Ex. 7. The Part B Standard Provisions also include § B4.1 addressing the method of payment. *Id.* That section states that the "Purchaser [WSFPI] shall pay for the timber covered by the contract in advance of cutting, as a single payment or installment payments in sales of predetermined volumes or in the form of advance payments or advance deposits in sales of estimated volumes." *Id.* Presumably, this portion of § B4.1 did not apply because, as stated above, the Cutting Contract did not require advance payments given that WSFPI is a tribal forest enterprise and exempt from the pre-payment requirement under 25 C.F.R. § 163.22(a). Moreover, because § A8 of the timber sale contracts provides that payment is to be in accordance with § B4.0 of the Standard Provisions *or* § 6 of the Cutting Contract, payment obligations could be governed by the Cutting Contract and not the prepayment language in § B4.1. Section B4.1 continues, however, and further states that payments and deposits "shall be by check or postal money order, drawn payable to the Bureau of Indian Affairs, or in cash, and shall be transmitted to the Superintendent." *Id.* Presumably, because the Cutting Contract was silent as to whom WSFPI was to actually pay, this part of § B4.1 applied.

/ / /

III.  WSFPI's Contracts with Defendant

By 2008, WSFPI's economic condition had begun to deteriorate and the Tribe considered

closing the WSFPI sawmill.  Tsumpti Decl. ¶ 12.  Instead of closing the mill, WSFPI entered into

discussions with Defendant which resulted in a term sheet and then two agreements.

A.  The 2008 Agreement/2009 Operations Agreement

In the fall of 2007, the Tribal Council WSFPI Board engaged in negotiations with

Defendant for Defendant to operate the WSFPI mill.  Javier Decl., Exs. 12, 15, ECF 66-12, 66-

15.  Tribal Council approved a preliminary Term Sheet outlining key terms to be used in

negotiating a final agreement with Defendant and appointed as its negotiating agent the Tribe's

Secretary-Treasurer who was also acting as CEO of WSFPI.  *Id.*.

WSFPI and Defendant then negotiated formal agreements.  From July 1, 2008 to

December 31, 2013, WSFPI and Defendant were parties to agreements relating to the operation

of the sawmill, including a July 1, 2008 Agreement and a June 30, 2009 Operations Agreement

(together, the "2008/09 Agreements").  Tsumpti Dec. ¶ 13.  Under the 2008/09 Agreements,

Defendant managed WSFPI's sawmill and also had the option to purchase all Tribal Timber

harvested by WSFPI pursuant to the Cutting Contract.  *See* Tsumpti Decl., Ex. 9 at 1-4 (2008

Agreement); *Id.* at 41-54 (2009 Agreement).  The 2009 Operations Agreement extended the

contractual relationship to June 30, 2014.  *Id.*, Ex. 9 at 48.

Key provisions of both agreements included the following:

(1) Recital D:  The current WSFPI Board was placed in abeyance by the Tribe and the

Tribe assumed the duties of the WSFPI Board; the CEO of WSFPI reported to the Tribe through

the Secretary Treasurer of the Tribe; (2) WSFPI would harvest logs and deliver them to the mill;

(3) Article 2.1: "Title to all Tribal Timber purchased by Vanport shall pass at the Mill, and all products and derivatives relating to the purchased Tribal Timber (including but not limited to lumber, residuals and chips) shall thereafter be the property of Vanport"; (4) Article 3.1: Defendant would serve as the mill manager; and (5) Article 5.1: Defendant would pay WSFPI on the 10th of each month the market price for all Tribal Timber purchased by Defendant between the 16th and final day of the preceding month; Defendant would pay WSFPI on the 25th of each month the market price for all logs purchased by Defendant between the 1st and 15th days of the current month. *Id.*, Ex. 9 at 1, 4, 6, 42, 44, 46.

B. The 2014 Operations Restructure Agreement & Related Agreements

During the life of the 2008/09 Agreements, WSFPI experienced continued financial decline. Michele Stacona was the Tribe's "treasury controller" in the Tribe's "finance department" from June 2006 through January 2010. Stacona Dep. 16. From January 2010 through June 2012, Stacona was the executive director of the Tribe's gaming commission. *Id.* at 19. After living and working in Arizona for several years, Stacona returned to the Tribe and has been the "secretary-treasurer chief executive officer" since November 2016. *Id.* at 19-20. The Tribe designated Stacona as a Rule 30(b)(6) witness on approximately fifty-one topics noticed by Defendant. During her deposition testimony, she testified that by year end 2013, the stumpage arrearage owed by WSFPI to the Tribe was $1,456,500. *Id.* at 143. During the life of the 2008/09 Agreements, Defendant was aware of WSFPI's financial problems. Kennedy Decl., Ex. 6 (Everett Dep.) 47 (stating that during the life of the 2008/09 Agreements, Defendant was aware from WSFPI financial statements that WSFPI was suffering losses every year), ECF 57.

Given the circumstances, WSFPI and Defendant entered into a new agreement effective

January 1, 2014, called the Operations Restructure Agreement. Tsumpti Dec. ¶ 14. It provided

for (1) early termination of the 2009 Operations Agreement; (2) entry into an agreement for

Defendant to provide export sales and marketing services to WSFPI; (3) the sale of certain assets

from Defendant to WSFPI; and (4) loans from Defendant to WSFPI for the purchase of inventory

and for a revolving line of credit. *Id.*; *see also* Tsumpti Decl., Ex. 10 (Operations Restructure

Agreement). Under the terms of the Operations Restructure Agreement, Defendant would no

longer purchase Tribal Timber. *Id.*

The following related agreements were entered into along with the Operations

Restructure Agreement: (1) Revolving Loan Agreement; (2) Security Agreement and a

Promissory Note; (3) Termination of Operations Agreement; (4) Sales and Marketing Services

Agreement; and (5) Bill of Sale for the Assets. Javier Decl., Ex. 22 (Ops. Res. Agmt. ¶ 2

referring to all of these related agreements); *Id.* (containing related agreements), ECF 66-22. I

refer to these collectively as the "2014 Agreements."

Defendant points to the following terms of the Sales & Marketing Agreement as relevant:

(1) § 2.1(a): Defendant would purchase and market all export lumber products manufactured by

WSFPI at the mill on an exclusive basis; (2) § 2.1(b): Defendant would provide on-site sales,

marketing, and quality control assistance at the mill relating to milling, grading, packaging, and

shipping quality in order to maximize selling value for export markets; (3) § 3.1(a): Defendant

would earn five-percent of the final selling price for export lumber; (4) § 3.1(b): All prices of

export lumber were FOB mill and Defendant assumed all risk of damage/loss upon delivery of

export lumber to a carrier; (5) § 3.1(c): Payment terms were net fifteen days of the date of

WSFPI's invoice; and (6) § 3.4(d): WSFPI warranted that all title to the lumber sold under the

agreement would be unencumbered when title passed to Defendant.  Javier Decl., Ex. 22 at 49-51.

Under the 2014 Agreements, beginning January 1, 2014 and continuing until April 30, 2016, Defendant provided invoicing and collection services for WSFPI's domestic sales of Tribal Timber.  Newton Decl., Ex. 2 at 7 (Def.'s Resp. to Receiver's Objs. to Def.'s Claim Dated May 27, 2018), ECF 58.  Vanport collected over $23,000,000 in receipts from WSFPI's domestic sales of forest products.  *Id.*, Ex. 3 (Def.'s Sum. of Tribal Timber Domes. Receipts Collection 1/1/14-4/30/16).  Also during this time, Defendant itself purchased over $3,300,000 of domestic lumber from WSFPI.  *Id.*, Ex. 4 (Def.'s Sum. of Tribal Timber VPI Domes. Purchases 1/1/14-4/30/16).  And, Defendant served as the exclusive sales and marketing agent for WSFPI's export sales for forest products manufactured from Tribal Timber.  *Id.*, Ex. 5 (Sales & Marketing Agmt.).  Defendant purchased WSFPI's export lumber and resold it to foreign buyers, paying itself a five-percent commission.  *Id.*  The commission Defendant paid itself amounted to more than $1,200,000.  *Id.*, Ex. 6 (Def.'s Summary of Tribal Timber VPI Exp. Purchases 1/1/14-4/30/16).  Defendant also provided management services to WSFPI.  From January 1, 2014 through February 2016, it invoiced WSFPI $208,000 in management fees.  *Id.*, Ex. 2 at 7.  Finally, Defendant provided a line of credit to WSFPI that was secured by inventory and accounts receivable.  Defendant received significant principal and interest payments from WSFPI pursuant to the line of credit agreement.  *Id.*

V.  WSFPI's Relationship with the Tribe During the Relevant Time Period

Under the WSFPI Plan of Operation, the WSFPI Board of Directors was to have seven members.  Tsumpti Decl., Ex. 5 at 3.  The board members were divided into four classes with

differing initial terms of service so that every year, one or two members' terms expired. *Id.* at 3-4. Additionally, at least three positions, but not more than four, were required to be a nonmember of the Tribe who had interest in the economic and social development of the Tribe and its membership. *Id.* The Board members were to be appointed by the Tribal Council. *Id.* at 4. The Tribal Council had the power to remove the WSFPI board individually or wholesale. *Id.*

In October 2007, Tribal Council assumed the role of the WSFPI Board, removing the entire WSFPI Board for failure to make Tribal Timber payments. Greene Dep. 41-42. Defendant asserts that whenever the Tribal Council became the WSFPI Board, a violation of the WSFPI Plan of Operation occurred because all members of the Tribal Council are members of the Tribe but, as noted above, the WSFPI Plan of Operation required at least three, and no more then four, members of its board to be nonmembers of the Tribe. Plaintiff agrees that the "tribal council members don't meet the qualifications set forth in the plan of operations." Tr. of Oct. 23, 2019 Hr'g 57, ECF 83. But Plaintiff notes that the Plan of Operation did not address the situation of a financially distressed tribal entity and "the Tribe was doing the best that it could." *Id.*

Several months after October 2007, the BIA alerted the then-Tribal Council Chairman that pursuant to the Cutting Contract, WSFPI owed almost $1.4 million to the Tribe in stumpage fees. Javier Decl, Ex. 14 (March 2008 letter from BIA to Ron Suppah), ECF 66-14. It was during this time period, when the Tribal Council was the WSFPI Board, that the 2008/09 Agreements between Defendant and WSFPI were executed.

Tribal Council appointed a new WSFPI Board on December 14, 2010. Greene Dep. 61. This WSFPI Board existed until June 2013, when the Tribal Council dismissed it. Javier Decl., Ex. 19 (June 5, 2013 Tribal Resolution No. 11,762), ECF 66-19. Tribal Council again assumed

the role of the WSFPI Board. *Id.* During this second period when the Tribal Council was the WSFPI Board, Defendant and WSFPI executed the 2014 Agreements.

After the Tribal Council again took over the WSFPI Board in mid-2013, the Tribal Council knew that WSFPI owed $1.5 million in Tribal Timber payment obligations beyond WSFPI's previous balance. Greene Dep. 118-19; Javier Decl., Ex. 20, ECF 66-20. Still, the Tribal Council WSFPI Board committed WSFPI to an additional $341,000 in Tribal Timber payment obligations. *Id.* The Tribe knew that by the end of 2013, WSFPI owed $1,456,500 to the Tribe and that WSFPI operated at a loss of $2.4 million. Javier Decl., Ex. 20 at 2; Stacona Dep. 143.

On January 2, 2014, the Tribal Council voted unanimously to continue WSFPI operations. Greene Dep. 21. According to Stacona, the Tribal Council voted to approve the 2014 Agreements with Defendant, and thus continue WSFPI operations, because benefits such as preserving jobs for members of the community and supporting the logging business owned and operated by tribal members were achieved with this arrangement. Stacona Dep. 169-70. Danzuka, a member of the Tribal Council from May 2013 to May 2016, and as a result, a member of the Tribal Council WSFPI Board from June 2013 to the fall of 2014, states that the Tribe did not seek to amend the Cutting Contract to allow timber harvesting by other public companies because, in his opinion, one of the Tribal logging company owners sat on the Tribal Council and if the harvesting were open to outside bidders, that company and other tribal logging companies would not get work. Danzuka Dep. 62-63.

Under the WSFPI Plan of Operation, the WSFPI Board Chairman was to sign any contract or instrument authorized by the WSFPI Board. Tsumpti Decl., Ex. 5 at 9. Thus,

Greene, as WSFPI Board Chairman, but also a Tribal Council member, executed the 2014 Agreements on behalf of WSFPI.  Javier Decl., Ex. 22.

Stacona testified that in entering the 2014 Agreements, there was a risk that WSFPI would be unable to pay for all of the Tribal Timber obligations it would incur to the Tribe. Stacona Dep. 173-74.  Nonetheless, the Tribal Council WSFPI Board authorized and approved WSFPI obtaining a secured line of credit from Vanport for up to $4 million.  Stacona Dep. 177.

WSFPI, under the Tribal Council WSFPI Board, suffered a net income loss of $1 million during the first two quarters of 2014.  Greene Dep. 136, Javier Decl., Ex. 23, ECF 66-23.  By the end of the second quarter of 2014, the Tribal Council WSFPI Board had allowed WSFPI to accrue almost $2.3 million in Tribal Timber payment obligations.  Greene Dep. 139-40; Javier Decl., Ex. 24 at 20, ECF 66-24.

Defendant notes that Danzuka reported to the Tribal Council WSFPI Board that he thought that WSFPI would probably fail.  Danzuka Dep. 50.  But, the Tribal Council WSFPI Board took no action.  *Id.*  In Danzuka's opinion, this was because Tribal Council members had many family members that worked at the mill. *Id.* at 51.

In June 2014, the Tribal Council appointed the board of another Tribal wholly owned enterprise, the Warm Springs Composite Products Board, to be the WSFPI Board.  Javier Decl., Ex. 25, ECF 66-25.  Defendant asserts that this also violated WSFPI's Plan of Operation in number, non-tribal member status, and required expertise.  Greene Dep. 132-34.

V.  Events After 2014

As noted above, in 2014, WSFPI fell behind in its payments to the Tribe for WSFPI's purchase of Tribal Timber from the Tribe.  Tsumpti Dec. ¶ 15.  In the spring of 2015, the BIA

considered issuing a "cease and desist" order to WSFPI which would have prohibited further harvesting of Tribal Timber until WSFPI had paid its stumpage arrearage. *Id.* The Tribe, the BIA, and WSFPI developed a repayment plan which the Tribe approved in a July 14, 2015 resolution. *Id.* Still, WSFPI had an unpaid balance of $2,416,731 it owed the Tribe for Tribal Timber sold to WSFPI by the Tribe pursuant to the Timber Sale Contracts during 2014 and 2015. Johnson Decl. ¶ 4, ECF 56.

Then, during the latter half of 2015, WSFPI's financial condition continued to deteriorate. Tsumpti Decl. ¶ 16. By early 2016, WSFPI could not make its monthly payments under the repayment plan. *Id.* On April 1, 2016, the BIA issued to WSFPI a "Notice to Cease and Desist Cutting of All Forest Products" from the Tribe's forest lands. *Id.*

On April 11, 2016, the Tribal Council passed a resolution authorizing the commencement of a judicial receivership for WSFPI to manage its orderly wind-down in a manner that would protect the Tribe and its resources, and to minimize the impact on individual tribal members. *Id.* The BIA filed a proof of claim in the receivership action, declaring that it has "an ownership interest in any timber which was harvested and converted to finished products, but [for] which [WSFPI] never paid the Tribe." Kennedy Decl., Ex. 1, ECF 57.

STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence

of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial."  *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927-28 (9th Cir. 2009) (internal quotation marks omitted).  The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial.  *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material.  *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009).  The court draws inferences from the facts in the light most favorable to the nonmoving party.  *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011).

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

DISCUSSION

I.  Plaintiff's Claim

The Complaint contains several assertions[4], followed by a single claim for relief.  Compl. ¶¶ 5-20.  The relevant assertions are that (1) title to Tribal Timber is held in trust by the United

---

[4]  Although these assertions appear under the heading "Statement of Facts," some are legal assertions, not factual ones.

States for the benefit of the Tribe; (2) Tribal Timber was sold to WSFPI pursuant to standard BIA contracts, each of which provided that title to the timber covered by the contract did not pass to the purchaser until it had been scaled, paid for, and removed from the contract area; (3) pursuant to the 2014 Agreements, Defendant was to (a) provide export sales and marketing services to WSFPI beginning January 1, 2014, and (b) purchase and market all export lumber products manufactured by WSFPI; (4) Defendant took over all domestic lumber sales, in addition to export lumber sales, in early 2015; (5) from early 2014 until August 2015, WSFPI did not pay for the Tribal Timber delivered to it; (6) title to the Tribal Timber did not pass to WSFPI but instead remained with the United States as trustee for the Tribe and the beneficial interest in the Tribal Timber remained with the Tribe; (7) title to the Tribal Timber, as well as proceeds and products of the Tribal Timber, remained with the United States as trustee for the Tribe and entitling the Tribe to the proceeds; and (8) the unpaid value of the Tribal Timber delivered to WSFPI and then processed and delivered to Defendant is $2,416,731. *Id.* ¶¶ 5-16.

The claim for relief is not denominated or characterized as a particular legal theory. *Id.* ¶¶ 17-20. It is not stated to be a contract claim, a tort claim, a property claim, or a claim in equity. Instead, the unspecified claim asserts that: (1) the Tribe has an ongoing beneficial interest in Tribal Timber that was delivered to WSFPI but for which WSFPI did not pay the Tribe; (2) Defendant exercised dominion or control of the Tribal Timber in which the Tribe retained a beneficial interest; and (3) the unpaid value of the Tribal Timber delivered to WSFPI and acquired by Defendant is $2,416,731. *Id.* ¶¶ 17-20. The prayer for relief seeks a judgment against Defendant for $2,416,731, plus interest from the date of delivery to WSFPI until paid in full. *Id.* at p. 5.

In the summary judgment briefing, Plaintiff denies that the claim sounds in tort. Pl.'s Reply 5, ECF 74. It reiterated this position at oral argument. Tr. of Oct. 23, 2019 Hr'g 50 ("The Tribe's claim is not one for damages against Vanport for some sort of tortious breach or tortious harm caused to the Tribe. That is not this lawsuit.").

Instead, Plaintiff asserts that the nature of its claim "sounds in property." Pl.'s Reply 5 ("Because the nature of the Tribe's claim sounds in property, rather than tort, Vanport's arguments relating to conversion and trespass are not relevant."). The property right, as Plaintiff describes it, derives from the Tribe's sovereignty and its trust relationship with the United States. *Id.* at 6 ("The Tribe's sovereignty and its trust relationship with the United States give rise to a federal common law right to enforce its aboriginal property rights in the proceeds of the Tribal Timber that are the subject of this action."). Plaintiff explains:

> The Tribe has a substantial ownership interest in the Tribal Timber and the proceeds derived from their sale that is shaped and protected by federal common law, the 1855 Treaty, and applicable federal statutes and regulations relating to the sale and disposition of tribal timber. Thus, the Tribe has a cause of action under federal common law to vindicate its interest.

*Id.* at 6; *see also id.* at 1 ("This action is premised on the Tribe's federal common law right to enforce its aboriginal property rights in the proceeds derived from the sale of Tribal Timber, the legal title to which is held in trust by the United States for the benefit of the Tribe. The Tribe's right to maintain this action is supported by the Constitution, the 1855 Treaty, federal statutes and regulations, and United States Supreme Court precedent spanning more than a century.").

Although Plaintiff asserts that the claim sounds in property, at oral argument, Plaintiff's counsel was unable to tell the Court whether the claim is in equity or is at law. Tr. of Oct. 23,

2019 Hr'g 50.[5]  Thus, the precise nature of the claim remains unclear.

Nonetheless, the amalgam of law cited by Plaintiff, including the Constitution, the 1855 Treaty, various statutes and regulations, as well as case law, support the foundational principle that the United States holds legal title to the Tribal Timber in trust for Plaintiff.  When, how, and whether title to the Tribal Timber passed or did not pass appears to be based in the first instance on contract provisions.  Finally, if Tribal Timber is sold but title did not pass under the relevant contract provisions, the issue to be decided here is whether the Tribe has the right to follow the proceeds of the sale of Tribal Timber and claim a right to such proceeds from a third-party which fulfilled its contractual obligations and paid for the Tribal Timber and/or its products.

## II.  Contract Provisions Revisited

As explained above, the Cutting Contract gave WSFPI the right to enter into specific timber sale contracts with the Tribe for Tribal Timber.  It contained a payment provision, but was silent regarding the passage of title.  The Cutting Contract also provided that timber would be sold under the "terms and conditions in a Contract Form . . . agreed to" by the Tribe and WSFPI, and approved by the BIA.  Tsumpti Dec., Ex. 8 at 11-12,§ 5f.

This case involves the six specific timber sale contracts appended as Exhibits 1-6 to Brunoe's Declaration.  Consistent with the Cutting Contract, the timber sale contracts were on forms approved by the BIA.  Part A of each of the six contracts addressed the individualized

---

[5]  In describing the claim, Plaintiff's counsel explained that the Tribe was "simply seeking to recover the value of the trust asset owned by the United States for which the trust has not been paid" and noted that this was a "narrowly scoped lawsuit" which "addresses six timber sale contracts." Tr. of Oct. 23, 2019 Hr'g 50.  This prompted my question to counsel: "So is that a claim in equity?"  *Id.*  Counsel responded: "That's a good question, Your Honor.  And we've not been able to resolve that.  We've looked into it.  It's unclear to us." *Id.*

information related to a specific timber sale. Part B contained standard, boilerplate provisions, including the provision stating that title did not pass until the logs were scaled, paid for, and removed from the contract area. Based on this language, Plaintiff argues that title to the Tribal Timber did not pass from the Tribe (seller) to WSFPI (buyer) because WSFPI failed to pay for it.

Defendant contests whether the Part B Standard Provisions were actually part of these timber sale contracts. Without this Part B title passing provision, Defendant suggests Plaintiff has no claim. I reject Defendant's argument because even construing the facts in a light most favorable to Defendant, Defendant fails to create an issue of fact as to whether the Part B Standard Provisions applied to these timber sales.

Defendant relies on the testimony of John Katchia who stated that the Form B Standard Provisions, including § B2.1 relating to title, were not in Deposition Exhibit 10, identified as the Buckskin 2012 timber sale contract, which is one of the six timber sale contracts in the summary judgment record. J. Katchia Dep. 117, 118.[6] He further testified that he tried to find the Part B Standard Provisions, "and we never could get any response from either tribal or BIA as to what Part B was." *Id.* at 119. He stated that he never found out what the standard provisions were. *Id.*

John Katchia's testimony does not create an issue of fact. For the purposes of this Opinion, I assume that Katchia's testimony regarding one timber sale contract would be the same as to all six of the timber sale contracts. Even assuming that the Part B Standard Provisions were not attached to any of the six timber sale contracts, and further, that Katchia did not have copies of the Part B Standard Provisions and did not have knowledge of the provisions, this does not

---

[6] Defendant represents that Katchia testified that the Part B Standard Provisions were not included in "any of the timber sales contracts he reviewed[,]" Def.'s Resp. 40, ECF 79, but the cited testimony appears limited to Deposition Exhibit 10 which is identified as a single contract.

mean they were inapplicable. Given that the Part B Standard Provisions were expressly incorporated by reference into each of the six contracts, Katchia's lack of knowledge is not enough to suggest that the Part B Standard Provisions did not apply.

Next, Defendant cites to the deposition testimony of Claude Smith, WSFPI timber manager from 2008 until the mill closed in 2016, who was responsible for executing most of the timber sale contracts for WSFPI. Javier Decl., Ex. 5 (Smith Dep.) 34-35, ECF 66-5. Defendant represents that Smith testified that the Part B Standard Provisions that Smith used in carrying out his duties as WSFPI timber sales manager had many provisions crossed out as inapplicable to WSFPI. Def.'s Resp. at 40-41 (citing Smith Dep. 122). Defendant states that Smith stated that § B2.1, regarding title, could have been crossed out. *Id.* (citing Smith Dep. 122).

The cited deposition testimony is unclear. Smith was asked if he "ever had any specific discussions about that provision out of all of these provisions in this timber sale contract Part B." *Id.* at 121. He answered: "Not really. Especially not - - I don't remember but I'm sure we did." *Id.* at 121-22. The preceding questions do not identify "that provision" or "this timber sale contract." *Id.* at 120-21. The questions are directed to Smith's knowledge as to whether WSFPI ever sold any forest products to any third party before WSFPI had paid for the logs. *Id.* at 121. Smith goes on to testify that "[a] lot of it's crossed out." *Id.* at 122. Although he is referring to an exhibit at the deposition, the cited pages do not identify the document. His testimony does not support Defendant's assertion. Moreover, even if I assumed that he identified the title provision in § B2.1, his testimony about whether that particular provision was crossed out is speculative and does not create an issue of fact regarding the applicability of the title provision.

Finally, Defendant cites to a September 30, 2013 Tribal Council Resolution which,

according to Defendant, shows that title to certain logs passed before WSFPI paid for them. Def.'s Resp. 41 (citing Javier Decl., Ex. 63, ECF 66-63). Defendant argues that under this Resolution, title to these logs passed on January 15, 2014, which was before WSFPI paid for them and thus, this shows that the Form B Standard Provisions, and specifically § B.2.1, did not apply to WSFPI. *Id.* (citing Everett Decl. ¶¶ 1, 11, ECF 67; *id.*, Ex. 2). This evidence does not establish that the Form B Standard Provisions did not apply to the six timber sale contracts at issue here. The resolution governed title as to a particular harvest occurring in the final months of 2013 and allowed title to pass without payment. A single modification particular to a specific harvest does not establish that the Part B Standard Form title provision was generally inapplicable.

I reject Defendant's argument that there is a genuine issue of material fact as to the application of the Form B Standard Provisions to each of the six timber sale contracts at issue in this case. Thus, at this point, the governing contracts provided that title to the Tribal Timber did not pass until the timber was scaled, paid for, and removed from the contract area.

III. Alter Ego Theory

Defendant argues that summary judgment to the Tribe must be denied because there are genuine issues of material fact as to whether payments by Vanport to WSFPI should be considered payments to the Tribe under an "alter ego" theory. Defendant contends that a reasonable factfinder could conclude that the Tribe itself was paid because it owned, controlled, directed, and was responsible for WSFPI's actions. Defendant states that the Tribe made little effort to distinguish WSFPI as a separate entity and for the bulk of the relevant time period, the Tribe was WSFPI because the Tribal Council was the WSFPI Board of Directors. Defendant

argues that WSFPI's independence was a fiction. Acting as the WSFPI Board from October 2007 to December 2010, and then again from June 2013 to the fall of 2014, Defendant contends that the Tribe made business decisions for WSFPI that were unsuccessful. Defendant asserts that the WSFPI debt was due to a conscious decision by the Tribe, with BIA consent, to allow what should have been payment for Tribal Timber to instead be used to keep the mill running.

Defendant first relies on case law arising in the context of sovereign immunity for tribal business entities where courts have developed a number of factors to determine whether the business entity is an "arm of the tribe" entitled to immunity, or is an independent entity subject to suit. Defendant then relies on cases which address the exercise of personal jurisdiction over a corporation based on its relationship with a parent or subsidiary corporation.

Both state and federal courts have "attempted to establish a set of factors to be considered when determining whether a tribal organization is entitled to tribal immunity." *Warren v. United States*, 859 F. Supp. 2d 522, 540 (W.D.N.Y. 2012) (citing to several state and federal cases including *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Econ. Dev. Auth.*, 629 F.3d 1173 (10th Cir. 2010)), *aff'd*, 517 F. App'x 54 (2d Cir. 2013). "The tests employed by these courts are variations of what is typically referred to as the 'subordinate economic entity' analysis." *Id.*

The *Warren* case lists the following factors as relevant to a finding that a tribal organization is so identified with a tribe itself as to justify granting tribal sovereign immunity to the tribal organization:

> the entity is organized under tribal constitution or laws (rather than federal law);
> the organization's purpose(s) are similar to a tribal government's (e.g., promoting tribal welfare, alleviating unemployment, providing money for tribal programs);
> the organization's managing body is necessarily composed primarily of tribal officials (e.g., organization's board is, by law, controlled by tribal council

members); the tribe's governing body has the unrestricted power to dismiss members of the organization's governing body; the tribe is the legal owner of property used by the organization, with title held in the tribe's name; the organization's administrative and/or accounting activities are controlled or exercised by tribal officials; and a suit against the entity will impact tribal resources.

*Id.* In a recent case from this District, Magistrate Judge Russo explained that

> Native American Tribes . . . are entitled to the same immunity from suit that is enjoyed by sovereign powers. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). Tribal sovereign immunity applies to both commercial and governmental activities of the Tribe, including tribal corporations "acting as an arm of the tribe." *Miller v. Wright*, 705 F.3d 919, 923-24 (9th Cir. 2013). If tribal immunity extends to a commercial entity acting as an "arm of the tribe," the court does not have jurisdiction over the suit. *United States v. Jones*, 225 F.3d 468, 469 (4th Cir. 2000).

> To determine whether an entity acts as an "arm of the tribe," courts consider: "(1) the method of creation of the economic entities; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) the tribe's intent with respect to the sharing of its immunity; and (5) the financial relationship between the tribe and the entities." *White v. Univ. of California*, 765 F.3d 1010, 1025 (9th Cir. 2014) (quoting *Breakthrough Mgmt. Grp. v. Chukchansi Gold Casino Resort*, 629 F.3d 1173, 1188 (10th Cir. 2010)).

*Hunter v. Redhawk Network Sec., LLC*, No. 6:17-CV-0962-JR, 2018 WL 4171612, at *2 (D. Or. Apr. 26, 2018), *adopted by J. McShane*, 2018 WL 4169019 (D. Or. Aug. 30, 2018). *White*, the Ninth Circuit case cited by Judge Russo, lists factors which overlap with the cases captured in *Warren*. Indeed, both *White* and *Warren* rely on the Tenth Circuit's case of *Breakthrough*.

An analysis of the relevant factors as applied in this case reveals the following:

(1) WSFPI was organized under the Tribe's Constitution and Tribal Corporate Charter.

Plaintiff argues that WSFPI was created under federal law, specifically under § 17 of the IRA.

That statute gave the Tribe *the right* to create tribal corporations but it did not actually create

WSFPI.  The Tribe itself created WSFPI pursuant to its Tribal Corporate Charter.

(2) WSFPI's purposes are similar to those of a tribal government because they include operating the industrial complex and logging operations to secure the maximum economic return from the timber resources consistent with providing the Tribe and its membership with education and training benefits, employment opportunities, and social benefits;

(3) The seven-person WSFPI Board was to be composed of at least three, and up to four, Tribal Members;

(4) Tribal Council retained the unrestricted power to dismiss members of WSFPI's governing body;

(5) The Tribe is the beneficial owner of property used by WSFPI, but the Tribe is not the legal owner; nonetheless, the legal owner holds the property in trust for the Tribe; and

(6) Given the extensive periods of time in which the Tribal Council became the WSFPI Board (2007-2011, 2013-14), WSFPI's administrative and/or accounting activities were actually controlled or exercised by tribal officials.

If this were a case where a third-party was suing WSFPI and WSFPI attempted to assert sovereign immunity due to it being an arm of the Tribe[7], the analysis of the factors weighs heavily in favor of finding that WSFPI is an extension of the Tribe such that sovereign immunity would shield it from suit.  The Tribe's creation of WSFPI, WSFPI's purposes, the Tribal Council's retention of the power to dismiss members of WSFPI's board, the Tribe's beneficial ownership of the property that WSFPI used, and the several years in which the Tribal Council

---

[7] I emphasize that this it *not* the claim asserted here.  I refer to the sovereign immunity cases in which third parties sue a tribal organization only by analogy.

substituted itself for the WSFPI board all combine to suggest that by analogy, WSFPI is an alter ego of the Tribe such that Defendant's contractual payments to WSFPI constituted payment to the Tribe.

As for the other line of cases, Defendant cites to *Harris Rutsky & Co. Insurance Services, Inc., v. Bell & Clements, Ltd.*, 328 F.3d 1122, 1134 (9th Cir. 2003). There, the plaintiff established that the subsidiary corporation had the necessary contacts with the forum for the assertion of personal jurisdiction. The relevant question was whether those contacts could be attributed to the parent. *Id.* As explained by the Ninth Circuit, a subsidiary's contacts can be imputed to the parent corporation where the subsidiary is the parent's alter ego. *Id.* To satisfy the

> alter ego exception to the general rule that a subsidiary and a parent are separate entities, the plaintiff must make out a prima facie case (1) that there is such a unity of interest and ownership that the separate personalities of the two entities no longer exist and (2) that failure to disregard their separate identities would result in fraud or injustice.

*Id.* at 1134-35 (internal quotation marks and brackets omitted). The plaintiff must show "that the parent exercises such control over the subsidiary so as to render the latter the mere instrumentality of the former." *Id.* at 1135 (internal quotation marks omitted); *see also Bishop v. GSW, Inc.*, No. CV. 05-1223-PK, 2006 WL 8442912, at *3 (D. Or. May 17, 2006) ("In order to hold that a subsidiary is the alter ego of a parent, the court must first find that the parent company controlled the subsidiary company to such a degree that the separate personalities of the two companies no longer exists."), *adopted by J. Brown*, 2006 WL 8442911 (D. Or. July 28, 2006).

In *Harris Rutsky*, the Ninth Circuit considered some facts particular to corporate entities such as control of stock ownership. *Id.* at 1135 (court observed that 100% control of subsidiary through stock ownership did not by itself make a subsidiary the alter ego of the parent). Other

factors were not determinative. *Id.* (companies being run by the same senior officers and directors, sharing the same offices, and sharing some of the same staff, did not necessarily render one the alter ego or agent of the other). As long as the parent's involvement was consistent with the parent's investor status, alter ego liability would be unwarranted. *Id.* However, the court observed that the principal owner of the subsidiary was the chairman of the parent's board and he himself drafted the relevant agreement. *Id.* These facts could expose more "control over day-to-day activities" which would be inconsistent with a parent's investor status. *Id.* In the end, the Ninth Circuit did not resolve the issue because it concluded that the district court abused its discretion in denying the motion for jurisdictional discovery. *Id.*

In a more recent Ninth Circuit case, the plaintiff, a United States citizen residing abroad, brought federal employment discrimination claims against Nike European Operations Netherlands (NEON), as well as against Nike, NEON's parent, here in Oregon. *Ranza v. Nike, Inc.*, 793 F.3d 1059 (9th Cir. 2015). The plaintiff argued that Nike's contacts with Oregon could be attributed to NEON to establish personal jurisdiction over NEON. *Ranza* explained that to satisfy the alter ego test, the plaintiff must show "(1) that there is such unity of interest and ownership that the separate personalities of the two entities no longer exist and (2) that failure to disregard their separate identities would result in fraud or injustice." *Id.* at 1073 (internal quotation marks omitted). The "unity of interest and ownership prong of this test requires a showing that the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former." *Id.* (internal quotation marks omitted). Because the case involved two corporations, the relevant factors reflected that context. *Id.* (noting involvement in acquisitions, divestments, and capital expenditures; formulation of general business policies and

strategies applicable to the subsidiary including specialization in particular areas of commerce; provision of loans and other types of financing to subsidiaries; maintenance of overlapping directors and officers; observance of corporate formalities such as adequate capitalization at each entity, and the proper documentation of transactions between the entities).  Still, *Ranza* confirms that the alter ego concept is used in assessing personal jurisdiction in cases arising under federal law and that the key issue under the unity and interest prong of the analysis is whether the relationship between the two entities is such that the individual identities are not apparent.

When applying the corporation alter ego factors here, this analysis also favors a conclusion that WSFPI was the alter ego of the Tribe.  The Tribal Council, by creating WSFPI, formulated its general business policies and purposes.  WSFPI was formed to benefit the Tribe. And, the Tribal Council, by taking over the WSFPI Board, was involved in acquisitions and the formation of contracts with third parties.

Plaintiff argues that Defendant's legal authority is inapplicable because the cases regarding a tribal organization's sovereign immunity do not involve a relationship between a tribal government and a tribal corporation, and further, *Harris Rutsky* is not an Indian law case. Plaintiff is correct that neither line of cases arises in the same context as presented here.  But, contrary to Plaintiff's suggestion, they have relevance by analogy.

Plaintiff also argues that (1) WSFPI is a separate legal entity formed pursuant to federal law; (2) the Tribe, WSFPI, and the United States have always understood and respected WSFPI's separate existence; and (3) Defendant has been aware of the Tribe's and WSFPI's legal separateness.  None of these arguments persuades me that WSFPI had an identity independent of the Tribe.

Plaintiff notes that tribal corporations formed pursuant to IRA § 17 are separate legal entities from tribal governments. Plaintiff points out that the BIA's forestry regulations recognize the independent legal status of tribal forest enterprises which are initiated and organized by a reservation's recognized tribal government. Further, Plaintiff states, the regulations "adhere to the notion that tribal forest enterprises are separate legal entities from the tribal owner of timber." Pl.'s Reply 15 (citing as an example 25 C.F.R. § 163.13(c) which allows tribal forest enterprises to contract for the purchase of forest products on Indian land).

Plaintiff also argues that the Cutting Contract and the timber sale contracts reinforce the separateness of WSFPI. The Cutting Contract requires that the Tribe and WSFPI enter into "formal agreements for the purchase of tribal timber on the Warms Spring Reservation." Tsumpti Decl., Ex. 8 at 8, §5a. The Cutting Contract also requires that Tribal Timber be sold to WSFPI pursuant to a form approved by the BIA. *Id.* at 11-12, § 5f. And, the individual timber sale contracts identify the Tribe as the seller and WSFPI as the purchaser of the Tribal Timber, reflecting that they are separate entities. Plaintiff contends that these contracts would not have been entered into if WSFPI was not considered a separate legal entity by the Tribe, WSFPI, and the United States. Additionally, Plaintiff argues that if the BIA did not recognize WSFPI as an entity separate from the Tribe, it would not have filed the proof of claim in the WSFPI receivership.

There is no dispute that WSFPI is a separate legal entity from the Tribe. But, the point behind the sovereign immunity cases and the personal jurisdiction cases analyzing the relationship between a parent corporation and its subsidiary, is that *notwithstanding* that the two entities involved are separate legal entities, they are nonetheless treated as the *same* entity. While

the sovereign immunity cases do not involve a Tribe and its tribal corporation as adverse parties, the cases recognize that a tribal corporation is a distinct entity from a tribe. Nonetheless, based on the relevant factors, a tribe's sovereign immunity may still apply to the separate legal tribal corporation. Similarly, in the corporation context, a Secretary of State's office (or corporation division, or similar agency) typically recognizes the independent legal status of a subsidiary corporation which has been initiated and organized by the parent corporation. And, any given subsidiary likely enters into independent contracts to purchase products or services from a parent. But, based on the factors relevant in those cases, certain conduct may allow the corporations to be seen as indistinguishable. Thus, that WSFPI was created as a separate legal entity, is recognized by the BIA and BIA regulations as an independent legal entity, and has entered into contracts with the Tribe as a separate legal entity is not determinative of how it should be treated for the purposes of this litigation.

Plaintiff also argues that Defendant understood that WSFPI was a legally independent entity from the Tribe. In support, Plaintiff relies on the 2014 Agreements and a June 2013 email from Defendant's General Manager Chris Ketchum to others at Vanport International. Pl.'s Reply 17 (citing Newton Sec. Decl., Ex. 2 (Ketchum email), ECF 75-2); *id.* (citing Javier Decl., Ex. 22 at 11, 23, 35, 44, 46-47, 52, 56 (portions of 2014 Agreements containing a limited waiver of WSFPI's sovereign immunity, expressly noting that this applied only to WSFPI and no other parties, including the Tribe)). Even assuming that these documents show that Defendant understood WSFPI to be a separate entity from the Tribe[8], conduct by the entities may still

___

[8] Ketchum's email first notes that he viewed "today's meeting with Tribal Council as very positive." Newton Sec. Decl., Ex. 2. He then said that the Tribal Council "came to WSFPI to squelch rumors that council was planning to shut down the mill." *Id.* Next, he wrote that the

establish that one should be viewed as the instrumentality of the other.

Plaintiff's arguments are unpersuasive. Under the factors considered in either the sovereign immunity analysis or the corporation analysis, WSFPI is appropriately considered as an arm, or instrumentality, of the Tribe. The conduct described above indicates that separate personalities did not exist. Additionally, the second step of the corporation alter ego analysis requires a finding that disregarding the separate identities would result in an injustice. That is the case here given that Defendant has already met its contractual obligations and paid for everything it purchased from WSFPI. Disregarding the separate identities could result in Defendant paying twice.

Defendant argues that when WSFPI is considered the alter ego of the Tribe, Defendant's payments to WSFPI constituted payment to the Tribe, and thus, title passed to WSFPI upon payment from Defendant and Defendant obtained the products with good title. This, Defendant

---

Tribal Council "confirmed that their main issue is to ensure that the Tribe is getting full value for their timber. This is especially important as other programs are laying off employees and reducing work hours due to budget shortfalls." *Id.* He continued: "I am sure that they are getting heat because of Vanport's presence. We are viewed as highly profitable, thereby taking money that would otherwise be available for programs that are being cut." *Id.* Plaintiff argues that this email shows that Defendant "plainly understood that the Tribe relied on revenue from the sale of Tribal Timber by its legally independent timber enterprise to fund the Tribe's governmental services." Pl.'s Reply 17. I disagree. While it shows that Defendant understood that the Tribe relied on revenue from the sale of Tribal Timber, it does not show that Defendant understood WSFPI to be a "legally independent timber enterprise," especially when the Tribal Council apparently met with Defendant to "squelch" rumors that the Tribal Council was planning to shut down the mill. Such conduct by the Tribal Council blurs, rather than clarifies, the independence of the Tribe from WSFPI. And, the 2014 Agreements were between WSFPI and Defendant. The Tribe was not a party. Thus, that WSFPI waived only its own sovereign immunity does not suggest any understanding by Defendant as to WSFPI's independence. In fact, that the 2014 Agreements specifically noted that immunity was waived only as to the WSFPI and not as to the Tribe, suggests that without such an express mentioning, it would not have been otherwise obvious that the immunity waiver did not apply to the Tribe.

contends, defeats Plaintiff's claim.

During oral argument, Plaintiff contended that even if WSFPI were deemed to be the equivalent of the Tribe, and thus, payment to WSFPI is to be viewed as payment to the Tribe, such payment is insufficient to transfer title. Plaintiff argued that the timber sale contracts required payment to the BIA and thus, payment to the Tribe does not satisfy the title transfer provision in § B2.1. Tr. to Oct. 23, 2019 Hr'g 12, 16, 17 (asserting that contracts required payment to the United States and referring to lock box set up to receive payments; stating that "[a]ll of the timber sale contracts provide that payment go to the United States. Every invoice is branded with a Department of Interior logo. And the instructions are to be paid to a lock box in Farmington Missouri, that's owned and maintained by the United States government"; confirming that even if the Tribe had been paid instead of WSFPI, "we [would still] be having this conversation" because the United States itself was not paid). Plaintiff indicated that payments for Tribal Timber must be made to the United States because payment directly to the Tribe would destroy its "character as trust revenue" and create "adverse tax consequences." *Id.* at 13.

Plaintiff is correct that Standard Provision §B4.1 of the timber sale contracts required payment to the BIA.[9] Nonetheless, the record unequivocally establishes that the Tribe administered the invoicing function. As part of that function, the Tribe either received payments or tracked them. Thus, the invoicing process and payment receipt are associated with the Tribe,

_____

[9] The Court finds no evidence in the record of language instructing that payment is to be made to a lockbox in Farmington, Missouri. *E.g.,* Johnson Decl., Ex. 2 (payment invoices issued to WSFPI by the Department of the Interior in 2014 and 2015 for WSFPI's purchase of Tribal Timber under the six timber sale contracts contain instructions to make electronic payment by going to "www.pay.gov" and instructions to make remittances payable to "Warm Springs Agency BIA" but have no information about a lockbox in Missouri, or anywhere else).

not the BIA. Importantly, the record shows that tribal members and others spoke of payments being owed or made to the Tribe, not to the BIA. This evidence strongly suggests that payment to the Tribe for Tribal Timber was believed to be the equivalent of payment to the BIA.

As Louise Katchia explained, she was responsible for invoicing WSFPI for the stumpage payments either on behalf of the BIA or the Tribe. Her testimony, which is supported by others, shows that the Tribe was aware of WSFPI's payment obligations and its failure to timely make payments. But, as she described, *the Tribe* was willing to essentially look the other way because WSFPI was a tribal enterprise. Danzuka confirmed that *the Tribe* did not press WSFPI to meet its contractual payment obligations because *the Tribe* itself was late to issue invoices. Therefore, the process of invoicing WSFPI and monitoring, if not receiving, WSFPI's payment obligations was handled by the Tribe, at least until 2014-15 when the BIA stepped in and worked with the Tribe and WSFPI to form the repayment plan. The record does not support that WSFPI's payment obligations for Tribal Timber under the timber sale contracts and the Cutting Contract were considered to be obligations to the BIA.

Additionally, the Tribe, tribal members, and the BIA all recognized that functionally, payment was to the Tribe, not to the BIA. Beginning with the Complaint, Plaintiff itself asserts that the "Tribe has an ongoing beneficial interest in Tribal Timber that was delivered to WSFPI *but for which WSFPI did not pay the Tribe.*" Compl. ¶ 18 (emphasis added). Dennis Johnson, "Treasury Controller" of the Tribe, states that the stumpage payments owed by WSFPI were to the Tribe. Johnson Decl. ¶ 2 (referring to the "Total Unpaid Stumpage Owing to *The Confederated Tribes of Warms Springs*" prepared from Department of the Interior invoices issued to WSFPI) (emphasis added). Tsumpti, who was first elected to the Tribal Council in

1992 and has served seven of the last eight terms on the Tribal Council, stated in his Declaration, that in "2014, WSFPI fell behind in its *payments to the Tribe for WSFPI's purchase of Tribal Timber*." Tsumpti Decl. ¶ 15 (emphasis added). Additionally, the 2015 Repayment Plan noted that the Tribe's "trust asset programs are replenished through the sale of timber from the Tribe[']s Trust Assets which are managed by the Branch of Natural Resources and the [BIA]," and that "WSFPI has a financial responsibility of providing Trust Revenue in the form of stumpage payments *to the [Tribe]* . . ." Tsumpti Decl., Ex. 11 (emphasis added). Former Tribal Council member Danzuka referred to WSFPI having "projected to give *the Tribe, $2 million, the Tribe would get $2 million*, but it wasn't necessarily following the payment plan as laid out in the cutting contract." Danzuka Depo. 89 (emphasis added). An independent auditor's report of WSFPI noted that WSFPI's operations "contribute annually to the general economy of the Tribe and surrounding communities." Javier Decl., Ex. 20 (Dec. 14, 2015 Audit Report from Moss Adams LLP) 9. The report expressly noted that "[s]pecific contribution measures include *stumpage* and harvest-related *payments to the Tribe*[.]" *Id.* (emphasis added).

Even the BIA refers to the payments being owed to the Tribe. Javier Decl., Ex. 14 (letter from BIA Superintendent to Tribal Council Chairman Ron Suppah stating that in regard to "stumpage billings[,]" WSFPI had certain 2007 and 2008 "payments either outstanding or due *to the Tribes*.") (emphasis added). And, the BIA's own Proof of Claim asserts that it retained an ownership interest in the Tribal Timber because of WSFPI's failure to pay *the Tribe*. Kennedy Decl., Ex. 1, ECF 57 (Proof of Claim filed by the BIA in the WSFPI receivership stating that the BIA "has an ownership interest in any timber which was harvested and converted to finished products, but which [WSFPI] *never paid the Tribes*.") (emphasis added).

In summary, Defendant's payments to WSFPI under the 2008/09 Agreements and the 2014 Agreements were payments to the Tribe because WSFPI is properly viewed as an arm, or instrumentality, of the Tribe.  Based on the evidence establishing how invoices and payments for the Tribal Timber were handled and the belief by Plaintiff, tribal members, the BIA, and others that payments were owed to *the Tribe* and that failure to pay *the Tribe* resulted in the BIA retaining an ownership interest in the Tribal Timber, it is appropriate to consider payments to the Tribe as payments to the BIA.  Therefore, title to the Tribal Timber passed when Defendant paid WSFPI.  Defendant is correct that this defeats Plaintiff's claim.

IV.  *Blue Lake*

In support of its claim, Plaintiff relies heavily on *In re Blue Lake Forest Products, Inc.*, 30 F.3d 1138, 1139 (9th Cir. 1994).  Plaintiff argues that *Blue Lake* supports its right to claim the Tribal Timber stumpage value from Defendant.  I disagree, and therefore, even if payment to WSFPI is not the equivalent of payment to the Tribe and to the BIA, Plaintiff is still not entitled to summary judgment.

The Ninth Circuit decision in *Blue Lake* is fairly succinct, but reading it along with the district court decision which the Ninth Circuit affirmed shows that *Blue Lake*'s facts are materially distinct from the instant case, making *Blue Lake* inapplicable here.  *Blue Lake* was a bankruptcy case involving competing rights to the proceeds from a sale of logs held in trust by the United States for the Hoopa Valley Indian Tribe (HVT).  Similar to the timber sale contracts at issue here, the HVT signed a timber sale contract with its wholly owned enterprise Hoopa

Forest Industries (HFI)[10] for the sale of tribal timber in the Pine Creek L logging unit. *Id.* at

1139. Similar to the timber sale contracts at issue here, the timber sale contract between the

HVT and HFI cross-referenced statutory provisions and regulations specifying that title to Indian

timber held in trust by the United States did not pass until the buyer, meaning HFI, paid for it.

*Id.* at 1139-40.

HFI entered into a log purchase agreement with a non-Indian third-party, Blue Lake

Forest Products, Inc., under which Blue Lake was to buy the logs from HFI and then process

them into lumber at its off-reservation mill. *Id.* at 1140. The log purchase agreement between

HFI and Blue Lake incorporated the relevant federal provisions and regulations. *Id.*

HFI delivered approximately 11.6 million board feet of timber to Blue Lake during four

months in 1990, but Blue Lake failed to pay for two months' of deliveries. *Id.* "HFI, in turn,

didn't make payments to [the HVT] under the Timber Sale contract." *Id.* Blue Lake filed for

bankruptcy. *Id.* At the time, it had approximately 1.5 to 2 million board feet of Hoopa Valley

logs at its property. *Id.* The same day Blue Lake filed for bankruptcy, the BIA sent a notice to

Blue Lake stating that the logs had not been paid for and demanding that Blue Lake cease any

processing of them. *Id.*

Based on a stipulation by the parties, the bankruptcy court issued an order permitting

Blue Lake to process and sell the HFI logs, and then to deposit the proceeds with the Hongkong

and Shanghai Banking Corporation ("the bank"), "with the tribe's claim to follow the proceeds."

*Id.* The bank had a claim of its own to the logs as a result of its security interest in Blue Lake's

---

[10] As the Ninth Circuit noted, HFI was actually wholly owned by the Hoopa Valley
Development Enterprise which was wholly owned by the HVT. *Id.* at 1139 n.1. The court
nonetheless stated that HFI was "a business venture wholly owned by the [HVT]." *Id.* at 1139.

after-acquired inventory. *Id.* Thus, the case addressed the competing claims by the bank and by the HVT to the proceeds of the logs.

The Ninth Circuit framed the issue as one of preemption. 30 F.3d at 1141 ("The question is whether [the principle that federal law offers heightened protection for property the United States holds in trust for Indian tribes] preempts the application of state commercial law[.]"). In describing the title status, the court explained that it was "clear, of course, that title to the logs never passed because the buyer (Blue Lake) never paid for them. The tribe, says, therefore, that the logs never ceased being its property, and so it- not the bank-is entitled to the money." *Id.* Although the court was aware that the timber sale contract with the title passing provision was between the HVT and HFI, the court nonetheless stated that title did not pass *because Blue Lake did not pay for the logs*. Notably, the court did *not* say that title did not pass because *HFI* failed to pay. In contrast, in the instant case, Vanport did pay WSFPI under all of the relevant contracts between those two entities.

The bank argued that under the Uniform Commercial Code, it took title to the property in which it had a security interest even when the party purporting to sell the property had voidable title. *Id.* The HVT argued that federal law, with its "particular attention to the heightened protection federal law affords property held in trust for an Indian tribe[,]" preempted the application of state commercial law. *Id.* Citing regulations under 25 C.F.R. Part 163 as well as 28 U.S.C. § 1360(b), the statute relied on by the district court, the Ninth Circuit observed that it was "clear that federal law affords heightened protection to timber the United States holds in trust for Indian tribes," and that Congress had specifically prevented "state courts from encumbering or alienating tribal assets held in trust and from promulgating state law rules

inconsistent with the federal law on this subject." *Id.* at 1140-41. In doing so, "Congress emphasized the special nature of the trust relationship between the United States and Indian property, a relationship upon which states are not free to intrude." *Id.* at 1141.

The court observed that the conduct at issue occurred on a reservation between Indians and non-Indians. Thus, the court did not apply the "normal principles of preemption." *Id.* at 1142. Instead, it was obligated to "undertake a 'particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law.'" *Id.* at 1141-42 (quoting *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 145 (1980)). Thus, "Indian law preemption [is] broader than traditional preemption[.]" *Id.* at 1142. In Indian law, "state law is preempted not only by an explicit congressional statement - the traditional preemption standard - but also if the balance of federal, state, and tribal interests tips in favor of preemption." *Id.*

In applying that analysis, the court observed that the "federal interests are very extensive and normally prevail over state interests in the regulation of timbering on Indian reservations." *Id.* (noting the long established practice of federal regulation of timbering on Indian land, as well as its extensive scope). Additionally, the court observed, "the United States, as trustee, has a fiduciary obligation to protect, manage, and operate Indian lands, including Indian timber." *Id.*

In contrast, the state interests were "rather meager" in the Ninth Circuit's view. *Id.* The court conceded that the state "presumably has an interest in seeing its laws applied uniformly and in protecting good faith purchasers[.]" *Id.* But, that interest was diminished with respect to those dealing with Indian entities or in Indian country. *Id.* Therefore, the court explained, "to the extent there is a conflict between state commercial law and federal laws affording heightened

protection to Indian trust timber, the former must give way." *Id.* In its concluding paragraph, the

court held that the district court properly granted summary judgment to the HVT. *Id.* "Title to

the logs remained with the United States as trustee, and the tribe is entitled to the proceeds from

the sale of the logs. To the extent state commercial law would yield a different outcome, it is

deemed preempted." *Id.* at 1142-43.

Plaintiff argues that "*Blue Lake* requires that Vanport pay to the Tribe the proceeds that

Vanport received from the sale of forest products derived from the Tribal Timber for which title

remained in the United State[s] because of lack of payment by WSFPI." Pl.'s Mot. 16. Plaintiff

contends that

> [l]ike the plaintiff-tribe in *Blue Lake*, the Tribe entered into [] written contracts
> with its tribal forest enterprise, here WSFPI, and the United States, as its trustee,
> to sell the Tribe's timber pursuant to the contracts and to federal law. And, like
> the contracts in *In re Blue Lake*, the Timber Sale Contracts incorporate applicable
> federal law and specify that title to the Tribal Timber does not pass unless and
> until WSFPI pays for the timber. WSFPI has not paid for the Tribal Timber at
> issue in this action. The Tribe's claim follows the proceeds derived from the
> Tribal Timber for which WSFPI failed to pay the Tribe, and the Tribe is entitled
> to those proceeds, including those proceeds received by Vanport. *See In re Blue
> Lake*, 30 F.3d at 1142[.]

*Id.* at 17-18.

Plaintiff fails to note the several differences between *Blue Lake* and this case. First, the

contractual relationship between HFI and Blue Lake is distinct from the relationship between

WSFPI and Vanporrt, both in formation and in provisions. The log purchase agreement between

HFI and Blue Lake was executed only four days after the timber sale contract for the Pine Creek

L logging unit. *In re Blue Lake*, 143 B.R. 563, 565 (N.D. Cal. 1992) (stating that the HVT-HFI

contract was executed on June 27, 1990 and the HFI - Blue Lake Log Purchase Agreement was

signed July 1, 1990). The timing in *Blue Lake* strongly suggests that the HFI - Blue Lake contract was executed specifically in regard to the particular Pine Creek L logging unit. In the instant case, the 2014 Agreements were not timed to any specific timber sale contracts or logging units. Thus, the close relationship between the HVT-HFI contract and the HFI-Blue Lake contract does not exist in this case.

The agreement between HFI and Blue Lake required Blue Lake to make payment by certified check jointly to HFI and to the BIA. Javier Decl., Ex. 58 (Log Purchase Agmt. ¶ 23 ("Payments for stumpage and fees shall be made by certified check jointly payable to HFI and the Bureau of Indian Affairs")). Defendant, in contrast, was obligated to pay only WSFPI, not the Tribe or the BIA, for the export lumber produced by WSFPI and purchased by Defendant. Furthermore, as of 2014, Defendant was paying for lumber whereas the contract at issue in *Blue Lake* referred to payment for stumpage and fees.

The agreement between Blue Lake and HFI stated it would not be interpreted or enforced in any manner that violated 25 U.S.C. § 407, 25 C.F.R. Part 163, or any other provision of federal law. *Id.,* ¶ 2. Defendant asserts there is no equivalent term in the 2014 Sales & Marketing Agreement it had with WSFPI. And, according to the Ninth Circuit, when entering its log purchase agreement with HFI, Blue Lake knew the terms of the timber sale contract between the HVT and HFI which included the provision that title to the timber would not pass until it was scaled, paid for, and removed from the cutting area. *See Blue Lake*, 30 F.3d at 1140 (stating that Blue Lake signed the log purchase agreement with knowledge of the timber sale contract between HFI and HVT). Here, the Tribe does not establish that Defendant knew, before the 2014 Agreements were executed, about the title passing provision in any of the six timber sale

contracts.

Thus, at the inception of their relationship, the contract between Blue Lake and HFI placed those parties in different postures than those created under the contractual relationship between Defendant and WSFPI. Here, Defendant and WSFPI had an ongoing relationship, not one related to a single specific timber sale. Defendant was required to pay only WSFPI, not the BIA or the Tribe. Blue Lake was obligated to pay for stumpage. Defendant was not. Nothing in the 2014 Sales & Marketing Agreement expressly applied federal law. There is no evidence that Defendant knew about the relevant title passing provision.

Next, *Blue Lake* concerned identified logs located in the mill yard, that Blue Lake, the non-tribal entity, had not paid for when it filed for bankruptcy. Here, the issue is whether Plaintiff can claim the right to proceeds from the sale of *lumber* purchased by Defendant from the tribal enterprise and which *Defendant paid for*. In *Blue Lake*, the BIA, on the day that Blue Lake filed for bankruptcy, demanded that Blue Lake cease processing the logs. Here, there was no comparable order or demand from the BIA that Defendant cease buying lumber from WSFPI and selling that lumber. The day after Blue Lake filed for bankruptcy, the parties stipulated to an order in the bankruptcy court that Blue Lake could process the logs and sell the lumber with the HVT's claim to the subject logs following the proceeds. Thus, because the bankruptcy court order approved of the processing, the sale and processing of the logs did not affect the HVT's claim to the logs. Here, Defendant paid WSFPI under the relevant contracts and there was no court order or other stipulation preserving any claim by the Tribe to the proceeds of the Tribal Timber following its sale by WSFPI. Additionally, the claim at issue in *Blue Lake* was to logs. Although the bankruptcy court had approved of their sale, the claim was actually to logs. *See In*

*re Blue Lake*, 143 B.R. at 569 (noting that the HVT was "entitled to recover the value of those *logs*" which, as a result of the bankruptcy court order, was now held by the bank in the form of proceeds) (emphasis added).  In contrast in this case, Defendant no longer possesses any logs or lumber and Plaintiff seeks proceeds from past sales without any comparable stipulation or court order as occurred in *Blue Lake*.  Most notably, as previously stated, Blue Lake itself failed to pay HFI/BIA for the logs.  Defendant, in contrast, paid WSFPI for all of its purchases.

Defendant's payment for the lumber places Defendant on a different footing than the position Blue Lake was in.  "Proceeds" are "[t]he value of land, goods, or investments when converted into money; the amount of money received from a sale[.]" *Black's Law Dictionary* 1242 (8th ed. 2004).  Here, WSFPI processed the Tribal Timber into lumber which it effectively sold to Defendant.  WSFPI received the value of the "goods" - the Tribal Timber, when it received payment from Defendant.  The "proceeds" from the value of the Tribal Timber is properly seen as the money Defendant paid to WSFPI.  Thus, money received by Defendant for the sale of lumber is not proceeds from the sale of the Tribal Timber.

Based on these factual distinctions between *Blue Lake* and the instant case, Defendant argues that it does not stand in the same place as the Blue Lake mill.  Defendant argues that the facts of *Blue Lake* do not support authorizing a claim by the Tribe to any of the lumber sale proceeds received by Defendant.  As Defendant states, *Blue Lake* awarded a creditor tribe priority over a creditor bank to logs possessed by a non-tribal debtor in bankruptcy because that debtor had failed in its contractual duty to pay for those logs.  But, *Blue Lake* did not make a buyer of finished lumber from a tribal enterprise a guarantor of that enterprises's obligations to the tribe that owned and controlled it.

Defendant further argues as follows:

> The policies expressed in *Blue Lake* are inapplicable. The federal policy affording heightened protection to Indian trust timber enunciated in *Blue Lake* is designed to protect tribal resources from non-tribal entities. In *Blue Lake*, a non-tribal entity did not pay for Tribal Timber when it took possession of that timber. Application of the federal policy protecting trust timber resulted in the Hoopa Tribe having superior rights over specific logs to which Blue Lake's Bank claimed a security interest. The federal policy acted as a shield to prevent the loss of valuable timber taken from the reservation in violation of contract and regulation.

> The federal policy is not a sword that this Tribe can wield against Vanport where Vanport acted in compliance with both contract and regulation obligations when purchasing timber from the Tribe's subordinate entity according to generally accepted trade practices and reselling it to export customers with the approval of the Tribe and BIA. The federal policy described in *Blue Lake* does not make a lumber purchaser responsible for intra-tribal decisions regarding how to spend lumber proceeds received by a tribal enterprise. With the Tribe's consent, WSFPI spent its proceeds on tribal benefits (mill and logger employment, etc.) instead of allocating them to Tribal Timber payments. Because *Blue Lake* is fundamentally distinct from the present matter, this Court should decline the Tribe's invitation to treat *Blue Lake* as authorizing the Tribe to bring an otherwise non-existent cause of action or claim for relief against Vanport.

Def.'s Resp. 45.

In reply, Plaintiff maintains that *Blue Lake* controls an outcome in its favor. Pl.'s Reply 4-5. Plaintiff argues that the fact that *Blue Lake* arose in the context of a bankruptcy action is not material because the HVT's ownership of the proceeds from the sale of logs held in trust for it by the United States did not depend on the bankruptcy code. Instead, the source of the HVT's substantive right to ownership of the proceeds from the sale of the logs was federal common law, the contours of which are found in "Supreme Court precedent and applicable treaties, statutes, and regulations." *Id.* at 5. And, Plaintiff continues, the "species" of the claim in *Blue Lake* is the same as the "species" in this case: a property claim. *Id.* In *Blue Lake*, Plaintiff asserts, because both the HVT and the bank asserted competing claims to the proceeds from the sale of logs, it

was in the nature of a property dispute. Here, Plaintiff states, the "nature of the Tribe's claim sounds in property[.]" *Id.*

Plaintiff's arguments are unavailing. Plaintiff repeatedly asserts that it is the owner of the logs and the proceeds of their sale. But, in *Blue Lake*, the "proceeds of their sale" existed only because of a bankruptcy court order, based on the parties' stipulation, that the logs, in Blue Lake's possession and for which Blue Lake had not paid, could be processed. Thus, pursuant to that order, the HVT retained an interest in proceeds instead of in logs which were part of the bankruptcy estate. Importantly, Blue Lake never paid for the logs it received. As the Ninth Circuit recognized, because Blue Lake did not pay HFI, HFI "'in turn" did not pay the HVA. In contrast, logs harvested by WSFPI under the six timber sale contracts were milled and Vanport paid for the lumber. Nothing here suggests that WSFPI's failure to pay the Tribe was because Defendant did not pay WSFPI. In contrast, as the Ninth Circuit observed in *Blue Lake*, title to the *logs* did not pass because *Blue Lake* did not pay for them.

Additionally, Defendant properly observes that the preemption policies described by the Ninth Circuit in *Blue Lake* are not implicated here. There is no question that federal law offers heightened protection to property held in trust for an Indian tribe. And, as the Ninth Circuit suggested, to effectuate this heightened protection, the "normal rules of preemption" do not apply when analyzing whether federal law preempts a state law in a case between an Indian entity and non-Indian entity. This case, however, does not present a preemption issue where a court must decide whether federal Indian law preempts a state law claim under a state's commercial code. Defendant, unlike the bank in *Blue Lake*, does not rely on state law to claim a right to property which then triggers the Tribe's invocation of federal Indian law principles. Here, Plaintiff,

instead of using the recognized heightened protection to defend itself from the state claims of a non-Indian entity, affirmatively relies on the federal policy to make a claim against a party which complied with its contractual obligations.

In summary, neither the facts nor the policies at issue in *Blue Lake* apply here. Plaintiff fails to recognize the material differences between the two cases. Plaintiff cites to no case in which a court found that an Indian tribe had a right to "proceeds" of a timber sale as against a third party when that third party purchased lumber from a tribal enterprise which had failed to pay the Indian tribe for the timber. Without any additional authority, Plaintiff's claim cannot be sustained.

V. Affirmative Defenses

Defendant pleaded fourteen affirmative defenses in its Answer. Answer ¶¶ 20-33, ECF 8. In its motion, Plaintiff argues that none of these defenses have merit. In response, Defendant focuses on only a subset of the fourteen. To the extent Defendant has not argued the merits of any of its affirmative defenses, I consider them to have been waived.

The remaining defenses are consent, failure to state a claim, and the equitable defenses of waiver, laches, and estoppel. Defendant asserts that consent is an absolute defense to a claim of conversion. Def.'s Resp. 51. Because Plaintiff expressly states that its claim is not a conversion claim, I do not further consider the consent defense. To the extent the claim is one at law, Defendant's equitable defenses are unavailable. To the extent that the claim is an equitable one, it unnecessary to consider the equitable defenses in light of my conclusion that Plaintiff's summary judgment motion must be denied. Finally, the failure to state a claim defense remains.

/ / /

CONCLUSION

Plaintiff's motion for summary judgment [54] is denied. The parties are instructed to contact the Courtroom Deputy to schedule a telephone conference with the Court to discus the status of the case and case schedule.

IT IS SO ORDERED.

Dated  December 16, 2019

_____
Marco A. Hernandez
United States District Judge